FILED
IN CLERKS OFFICE
US DISTRICT COURT E.D.N.Y.

★   SEP 23, 2019   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
UNITED STATES OF AMERICA,

                 *Plaintiff,*

      *-against-*

JEFFREY KAHN, as CO-EXECUTOR OF
THE ESTATE OF HAROLD KHAN

        *and*

JOEL KAHN, as CO-EXECUTOR OF
THE ESTATE OF HAROLD KHAN,

              *Defendants.*
--------------------------------X

**MEMORANDUM AND ORDER**

17-cv-7258(KAM)(VMS)

**KIYO A. MATSUMOTO, United States District Judge:**

       The United States of America ("the Government")
commenced this action against Jeffrey Kahn and Joel Kahn, the
co-executors of the estate of Harold Khan ("Mr. Khan") ("the
Defendants"), to reduce to judgment a civil penalty assessed
against Mr. Khan for his failure to file a "Report of Foreign
Bank and Financial Accounts" (an "FBAR") as required by 31
U.S.C. § 5314.  Pending before the court are the parties' cross-
motions for summary judgment.

       Although the parties did not submit Local Rule 56.1
statements in support of their motions, the parties do not
dispute the following facts, which the Court accepts.  Mr. Khan
willfully failed to file an FBAR for the 2008 calendar year by
the due date of June 30, 2009, *i.e.*, the date of the violation.

(ECF No. 19, Stipulation of Fact ("Stip.").)  This FBAR should have reported two accounts held by Mr. Khan at Credit Suisse, Switzerland, each of which held over $100,000 as of the date of the violation, with an aggregate value of $8,529,456.  (*Id.*)

Pursuant to 31 U.S.C. § 5321(a)(5), the Internal Revenue Service ("IRS") assessed a willfulness penalty for the failure to file the 2008 FBAR in the amount of $4,264,728, which represents fifty percent (50%) of the aggregate balance in the two accounts as of the date of the violation.  The Government seeks summary judgment in the amount of $4,590,697.32, plus statutory additions and interest from January 26, 2017.  The Defendants contend that the Government's calculation of the appropriate penalty is incorrect as a matter of law.

For willful FBAR filing violations after October 22, 2004, Congress explicitly increased the maximum penalties as set forth in 31 U.S.C. § 5321(a)(5)(C).  Title 31 U.S.C. § 5321(a)(5)(C) provides that "[i]n the case of any person willfully violating, or willfully causing any violation of, any provision of [the FBAR reporting requirement codified in] section 5314, the maximum penalty . . . shall be increased to the greater of $100,000 or 50 percent [of the balance in the unreported account(s) at the time of the violation]."  Thus, Congress increased the maximum penalty to the greater of

$100,000 or 50% of the balance in the unreported account(s) at the time of the violation. *See id.*

Because both of Mr. Khan's unreported accounts had balances over $100,000 at the time of the violation, the Government assessed a statutory penalty equal to 50% of their balances, representing a total penalty of $4,264,728. The Defendants, however, argue that despite this clear statutory authority, the Government is constrained by a Department of Treasury ("Treasury") regulation, 31 C.F.R. § 1010.820(g),[1] limiting FBAR penalties to no more than $100,000 per violation. Applying this regulation would result in a substantially lower penalty of $200,000 in this action.

The parties filed cross-motions for summary judgment to address their competing legal positions regarding the applicable statutory and regulatory authority. Their memoranda of law principally address the validity (or lack thereof) of 31 C.F.R. § 1010.820(g) in the face of subsequent amendments to 31 U.S.C. § 5321, the regulation's authorizing statute, which increased the statutory penalty ceiling to a level well in excess of that called for by the regulation.

---

[1] The regulation at issue was initially codified at 31 C.F.R. § 103.47(g) in 1987; moved to 31 C.F.R. § 103.57(g) in 1999; and finally moved to its current position at 31 C.F.R. § 1010.820(g) in 2010. For ease of reference, this Memorandum and Order refers to the regulation by its current citation, 31 C.F.R. § 1010.820(g), unless otherwise noted.

For the reasons set forth below, the Court grants summary judgment to the Government, because the regulation upon which Defendants rely is no longer valid, and the Government properly imposed the statutory penalty, and the Government is entitled to judgment in this action in the amount of $4,264,728, plus late-payment penalties and interest (to be determined upon submission by the Government and Defendants of evidence as to when the penalty was assessed).  Defendants' motion for summary judgment is denied.

## **BACKGROUND**

Treasury regulations require that each person holding a foreign bank account file an FBAR on Form TD F 90-22.1 for each year in which he or she holds such an account.  31 C.F.R. § 103.24 (2009) (codified as amended at 31 C.F.R. § 1010.250).  If he or she willfully fails to do so, the IRS – the agency currently responsible for enforcing the FBAR requirement – may by statute assess a penalty against that person up to the greater of (1) $100,000 or (2) 50% of the balance in the unreported account(s) at the time of the violation.

During the 2008 calendar year, Mr. Khan held two accounts at Credit Suisse in Switzerland.  (ECF No. 19, Stipulation of Fact ("Stip."), ¶ 3.)  Mr. Khan should have filed an FBAR reporting both of these accounts to the IRS no later than June 30, 2009.  (*Id.* ¶¶ 1-2.)  Mr. Khan, however, willfully

4

failed to do so. (*Id.*) The IRS consequently assessed a penalty against Mr. Khan in the amount of $4,264,728, representing 50% of the balance in the accounts he failed to report at the time of his violation, or the maximum penalty allowed by the FBAR penalty statute. (*Id.* ¶¶ 4-5.)

On December 13, 2017, the Government filed this action to reduce to judgment the $4,264,728 civil penalty assessed against Mr. Khan, plus statutory additions and interest. (ECF No. 1, Complaint.) The Defendants initially contested Mr. Khan's liability in its entirety (*see* ECF No. 6, Answer), but they later conceded that Mr. Khan willfully failed to file an FBAR and, as a result, that the IRS was owed a penalty in *some* amount (Stip.). The Defendants did not, however, agree with the Government's calculation of the penalty. After stipulating to the underlying facts (*see generally* Stip.), the parties filed cross-motions for summary judgment to address whether, as a matter of law, the IRS was authorized to assess, or abused its discretion in assessing, a $4,264,728 penalty against Mr. Khan.

## LEGAL STANDARD

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole*, 678

F.3d 166, 173-74 (2d Cir. 2012).  The role of the court is "'not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal quotation marks omitted)).  "A genuine issue of fact for trial exists where there is 'evidence on which the jury could reasonably find for'" the non-movant.  *Id.* (quoting *Liberty Lobby*, 477 U.S. at 252).

"Where, as here, a party seeks review of agency action under the [Administrative Procedure Act ("APA"), 5 U.S.C. § 553 *et seq.*] and the entire case on review is a question of law, summary judgment is generally appropriate." *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also UPMC Mercy v. Sebelius*, 793 F. Supp. 2d 62, 67 (D.D.C. 2011) ("Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review.").

"Under the APA, federal courts have jurisdiction to review 'final agency action for which there is no other adequate remedy in a court.'"  *Id.* (quoting 5 U.S.C. § 704).  "However, courts review agency actions under a deferential standard, under which such actions may only be disturbed if they are 'arbitrary,

6

capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial evidence.'" *Id.* (quoting 5 U.S.C. § 706(2)(A), (E)). "An agency abuses its discretion when it fails to present a rational explanation for its decision or if the decision is devoid of any reasoning." *Id.* (citing *Sinistovic v. Holder*, 429 F. App'x 37, 39 (2d Cir. 2011)); *see also Ke Zhen Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir. 2001). "A decision is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Noroozi*, 905 F. Supp. 2d at 541 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In reviewing an agency's decision, the court's task is not to "engage in an independent evaluation of the cold record," *Guan v. Gonzales*, 432 F.3d 391, 394-95 (2d Cir. 2005), nor to "substitute its judgment for that of the agency," *Natural Res. Def. Council*, 658 F.3d at 215 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). Rather, the court must determine whether the agency has "considered the pertinent evidence, examined the relevant factors, and

7

articulated a satisfactory explanation for its action."   *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000).

## DISCUSSION

The parties' dispute in this action turns on the interplay between statutory and regulatory law.   The Defendants have moved for summary judgment on the grounds that the IRS abused its discretion by ignoring a Treasury regulation, 31 C.F.R. § 1010.820(g), which caps civil penalties for willful FBAR violations at $100,000.   (ECF No. 22-2, Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Br."), at 1-2.)   The Government responds that 31 C.F.R. § 1010.820(g) simply parrots an earlier version of the FBAR penalty statute, 31 U.S.C. § 5321, and that subsequent amendments to that statute rendered the regulation obsolete.   (ECF No. 23-2, Mem. in Opp. to Defs.' Mot. for Summ. J. & Mem. in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl.'s Br."), at 1-2.)   Given the subsequent statutory amendments, the Government asserts, the IRS was not constrained by the regulation and could assess the full penalty authorized by statute.   (Id. at 1.)   The Court agrees with the Government.

## I.   History of the Willful FBAR Penalty

To understand the parties' dispute, it is important to begin with an examination of the language, legislative history, and regulatory history of both the FBAR penalty statute, 31

8

U.S.C. § 5321(a)(5), and the FBAR penalty regulation, 31 C.F.R. § 1010.820(g).

   a. Origin of the FBAR Reporting Requirement

        In 1970, Congress enacted the Bank Secrecy Act ("BSA") to combat money laundering and other financial crimes in the United States.  Pub. L. No. 91-508, § 202, 84 Stat. 1114 (1970).  One of the primary purposes of the BSA was to deter the use of foreign financial accounts to avoid tax obligations.  *See id.*  As a result, the BSA required that private individuals report their relationships with foreign financial institutions.  *Id.* § 241 (codified as amended at 31 U.S.C. § 5314).  Congress did not specify the form and substance of the report to be made in satisfaction of this requirement.  *Id.*  Instead, it vested the Secretary of the Treasury ("the Secretary") with the authority to prescribe these specifics.  *Id.*  To that end, Congress authorized the Secretary to promulgate regulations necessary to implement and enforce this reporting requirement.  *See id.* § 242.

        In 1972, the Secretary satisfied his obligation and promulgated regulations implementing the FBAR requirement.  37 Fed. Reg. 6912 (codified as amended at 31 C.F.R. Ch. X) (Apr. 5, 1972).  Specifically, the Secretary required that each person with an interest in a bank account in a foreign country report the relationship on his or her federal income tax return for

each year in which the relationship exists. *Id.* at 6913 (codified as amended at 31 C.F.R. § 1010.350). The form the Secretary prescribed has come to be known as an FBAR, and failure to file it could subject certain violators to civil money penalties.

b. Origin of the Civil Penalty on Private Individuals for FBAR Violations

As money laundering became an ever-larger problem, Congress passed the Money Laundering Control Act of 1986 ("the MLCA"). Pub. L. No. 99-570, Subtit. H, 100 Stat. 3207 (Oct. 27, 1986). Through the MLCA, Congress increased both the civil and criminal penalties associated with money laundering and related violations of the BSA. Most important for present purposes, Congress added a new civil money penalty that could be levied against private individuals for their willful failure to file an FBAR, which read as follows:

(5) **FOREIGN FINANCIAL AGENCY TRANSACTION VIOLATION.**-

(A) **PENALTY AUTHORIZED.**-The Secretary of the Treasury may impose a civil money penalty on any person who willfully violates any provision of section 5314.

(B) **MAXIMUM AMOUNT LIMITATION.**-The amount of any civil money penalty imposed under subparagraph (A) shall not exceed-

. . .

(ii) in the case of violation of such section involving a failure to report the existence of an account or any identifying information required

10

to be provided with respect to such account, the greater of—

(I) an amount (not to exceed $100,000) equal to the balance in the account at the time of the violation; or

(II) $25,000.

*Id.* § 1357 (codified as amended at 31 U.S.C. § 5321(a)(5)). The Secretary could now assess penalties against any private individual who willfully violated the FBAR reporting requirement, up to a ceiling of either $25,000 or an amount equal to balance of the account (not to exceed $100,000), whichever was greater. *Id.*

Shortly before Congress passed the MLCA, the Secretary issued a notice of proposed rulemaking seeking comments on a number of proposed amendments to the FBAR regulations. 51 Fed. Reg. 30233 (Aug. 25, 1986). This notice informed the public that the Secretary intended to, *inter alia*, "[c]orrect the civil penalty amount that can be assessed for willful violations of the recordkeeping requirements of this Part." *Id.* at 30236. More specifically, however, the notice indicated that "this [proposed] amendment corrects a technical error in the regulations that implemented the increase in civil penalty amount *made by the Comprehensive Crime Control Act of 1984.*" *Id.* at 30236 (emphasis added). The notice did not, however, include any language (or otherwise indicate) the Secretary's

intent to incorporate the new civil penalty against private individuals from the MLCA (nor could it have, given that this penalty would not become law for several more months). *See id.* at 30241 (setting forth the proposed amended penalty regulation).

Following the notice-and-comment period, the Secretary issued a final notice of the revised FBAR regulations. *See* 52 Fed. Reg. 11436 (Apr. 8, 1987). Despite the lack of notice, the Secretary stated that "[t]o keep the regulations as current as possible, the amendments to the civil penalty amounts now reflect civil penalties applicable to pre-1984 violations, civil penalties applicable to violations between October 1984 and October 1986 under the Comprehensive Crime Control Act, *and civil penalties for violations after October 1986 under the Anti-Drug Abuse Act of 1986* [subtitle H of which was the MLCA]." *Id.* at 11440 (emphasis added).

The Secretary also indicated that "[a] few commenters wished to have Treasury announce a 'safe harbor' of allowable civil violations of the regulations prior to assessing penalties." *Id.* The Secretary rejected this request and, in doing so, stated that "Treasury has been given the authority and responsibility to enforce the Bank Secrecy Act, and intends to do so to the fullest extent possible." *Id.* The revised FBAR

penalty regulation, which reflected the new penalties applicable

to private individuals, read as follows:

> (g) For any willful violation committed after October 27
> 1986, of any requirement of [§ 1010.350, § 1010.360 or §
> 1010.420], the Secretary may assess upon any person, a
> civil penalty:
>
> . . .
>
> (2) In the case of a violation of [§ 1010.350 or §
> 1010.420] involving a failure to report the existence
> of an account or any identifying information required
> to be provided with respect to such account, a civil
> penalty not to exceed the greater of the amount (not
> to exceed $100,000) equal to the balance in the
> account at the time of the violation, or $25,000.

*Id.* at 11446 (codified as amended at 31 C.F.R. § 1010.820(g)).

This regulation repeated almost verbatim the language of the new

civil penalty provision in 31 U.S.C. § 5321(a)(5).

   c. Renewed Emphasis on FBAR Compliance

         Following the foregoing amendments, the FBAR penalty

remained constant for a period of time.  But this would change

as money laundering came back into focus following the September

11, 2001, terrorist attacks.  Congress swiftly passed the

Uniting and Strengthening America by Providing Appropriate Tools

Required to Intercept and Obstruct Terrorism Act of 2001 ("USA

PATRIOT Act"), Pub. L. No. 107-56, § 361, 115 Stat. 272, which

strengthened anti-money laundering controls and provided that

the Secretary "shall study methods for improving compliance with

the [FBAR] reporting requirements established in section 5314 of

title 31, United States Code," and submit regular reports to

13

Congress on the subject. *Id.* Congress further directed that "[t]he initial report shall include historical data on compliance with such reporting requirements." *Id.*

The Secretary submitted his initial report on FBAR compliance to Congress in 2002. Secretary of the Treasury, *A Report to Congress in Accordance with § 361(b) of the USA PATRIOT Act*, Apr. 26, 2002. The report explained that "[i]n calendar year 1991, the [Detroit Computing Center, which receives filed FBARs], received 116,600 FBARs." *Id.* at 6. The report stated that "[i]t is difficult to determine with any accuracy how many taxpayers are failing to file required FBARs in any calendar year." *Id.* The Secretary noted, however, that the "IRS estimates there may be as many as 1 million U.S. taxpayers who have signature authority or control over a foreign bank account and may be required to file FBARs," leading to an approximate compliance rate of "less than 20 percent." *Id.* The Secretary detailed several potential causes of noncompliance and proposed several administrative changes that he believed had the potential to improve compliance rates. *Id.* at 10-13.

In addition to preparing this report, the Secretary had also been making administrative changes to the FBAR enforcement framework to improve compliance. In 2002, the Secretary delegated authority to administer civil compliance with the FBAR reporting requirement to the Director of the

Financial Crimes Enforcement Network ("FinCEN"). *Treasury Order 180-01; Financial Crimes Enforcement Network*, 67 Fed. Ref. 64697 (Oct. 21, 2002). The Secretary granted the Director full authority to promulgate and amend all FBAR regulations, subject to the caveat that all regulations in effect as of the enactment of the PATRIOT Act would continue in effect "until superseded or revised." *Id.* The Director of FinCEN also received authority to re-delegate this power within Treasury, as appropriate. *Id.* ("The Director of FinCEN may redelegate any authority vested under this Order to an officer or employee of the Treasury Department, including its bureaus.").

"In light of the disparity of resources between [the] IRS and FinCEN, [the Secretary indicated that these bureaus would] review whether the authority to impose civil sanctions for the failure to file FBARs should be delegated from FinCEN to the IRS." *Report to Congress in Accordance with § 361(b) of the USA PATRIOT Act*, at 13. The parties apparently agreed, and in 2003, FinCEN re-delegated the power to assess and collect civil penalties for willful FBAR violations to the IRS. *Financial Crimes Enforcement Network; Delegation of Enforcement Authority Regarding the Foreign Bank Account Report Requirements*, 68 Fed. Reg. 26489 (May 16, 2003). FinCEN did not, however, grant the IRS authority to promulgate or amend the FBAR regulations. *See generally id.*

15

### d. Increased Civil Penalty on Private Individuals for FBAR Violations

At the same time, Congress began to consider legislative changes of its own. Both chambers of Congress contemplated amendments to the FBAR penalty statute. Of particular relevance here is that while one chamber of Congress proposed substantially raising the penalty ceiling, the other proposed retaining the original caps. *Compare* H.R. Conf. Rep. 108-755 (2004) *with* S. Rep. No. 108-192 at 108 (2003). Congress ultimately elected to increase the penalties and, in 2004, amended the FBAR penalty statute to increase the prior-law penalty for willful behavior. The amended statute read, in relevant part, as follows:

> **(A) PENALTY AUTHORIZED.**—The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314.

> **(B) AMOUNT OF PENALTY.**—

>> (i) **IN GENERAL.**-Except as provided in subparagraph (C), the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000.

>>  . . .

> **(C) WILLFUL VIOLATIONS.**-In the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314-

>> (i) the maximum penalty under subparagraph (B)(i) *shall be increased* to the greater of-

>>> (I) $100,000, or

>>> (II) 50 percent of the amount determined under subparagraph (D), and

. . .

**(D) AMOUNT.**-The amount determined under this subparagraph is-

. . .

> (ii) in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, the balance in the account at the time of the violation.

American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821, 118 Stat. 1418, 1586 (codified as amended at 31 U.S.C. § 5321(a)(5)) (emphasis added).

The Joint Committee on Taxation, a Congressional Committee established under the Internal Revenue Code, explained Congress's intent in amending the statute:

> The Congress understood that the number of individuals using offshore bank accounts to engage in abusive tax scams has grown significantly in recent years. For one scheme alone, the IRS estimates that there may be hundreds of thousands of taxpayers with offshore bank accounts attempting to conceal income from the IRS. The Congress was concerned about this activity and believed that improving compliance with this reporting requirement is vitally important to sound tax administration, to combating terrorism, and to preventing the use of abusive tax schemes and scams. The Congress believed that *increasing the prior-law penalty for willful non-compliance* with this requirement and imposing a new civil penalty that applies without regard to willfulness in such noncompliance will improve the reporting of foreign financial accounts.

U.S. Congress, Joint Comm. on Tax., *General Explanation of Tax Legislation Enacted in the 108th Congress* (May 2005), at 378 (emphasis added).

17

Despite the foregoing amendment, however, neither the Secretary nor the Director of FinCEN amended the now-inconsistent FBAR penalty provision.  The IRS, which enforced the penalty provision, took the position that revisions were not necessary as the statute was "self-executing." *Internal Revenue Manual, 4.26.16.4.5.1 – FBAR Willfulness Penalty* (July 1, 2008). The IRS thus began to impose penalties in excess of the regulatory cap, which it considered to be superseded.  *See id.* And as of June 30, 2009, the FBAR penalty regulation, despite its apparent obsolescence, remained codified in the Code of Federal Regulations.[2]

### e. Litigation Over the Inconsistency Between the Amended Statute and Treasury Regulation

The relevant portion of the FBAR penalty regulation remained unchanged for almost a decade, leading to confusion as to the extent to which the IRS could penalize private individuals for willful FBAR violations.  On the one hand, Congress clearly provided for substantial penalties in the FBAR penalty statute, authorizing the Secretary (and, by delegation, the IRS) to assess penalties equal to the greater of $100,000 or 50% of the balance in the unreported account(s) at the time of

---

[2] The Secretary later re-numbered the FBAR regulations as part of a broader administrative re-numbering, but this reorganization did not incorporate – and in fact, expressly rejected – attempts to make substantive changes to regulations considered "obsolete." *Transfer and Reorganization of Bank Secrecy Act Regulations*, 75 Fed. Reg. 65806, 65807 (Oct. 26, 2010).

the violation.  On the other hand, the Secretary had not yet

specifically revised or repealed a regulation that, Defendants

argue, cabined his (and, by delegation, the IRS's) discretion to

impose penalties above $100,000 per violation.

      This inconsistency has engendered a substantial amount

of litigation in recent years.  The majority of courts

addressing this question have concluded that the statute and

regulation are inconsistent, rendering the regulation invalid.[3]

Only two courts have disagreed.[4]  For the reasons explained

---

[3] *United States v. Rum*, No. 17-cv-826, slip. op. at 14 (M.D. Fla. Aug. 2,
2019) (report and recommendation) ("[T]he regulation is no longer consistent
with the amended statute as the maximum penalty remained set at $100,000
rather than to the greater of $100,000 or 50% of the balance of the
account."); *United States v. Schoenfeld*, No. 16-cv-1248, 2019 WL 2603341, at
*5 (M.D. Fla. June 25, 2019) ("[T]he Court is of the view that the $100,000
penalty limit set forth in 31 C.F.R. § 1010.820(g) is inconsistent with the
statute and, therefore, without any legal effect."); *United States v. Park*,
No. 16-cv-10787, 2019 WL 2248544, at *9 (N.D. Ill. May 24, 2019) ("Congress
specifically and intentionally raised the maximum penalty for FBAR
violations, and no regulation promulgated by the Secretary can reduce it
again."); *United States v. Garrity*, No. 15-cv-243, 2019 WL 1004584, at *2 (D.
Conn. Feb. 28, 2019) ("The plain language of the 2004 amendment demonstrates
Congress's intent to authorize the Secretary to impose higher penalties for
willful FBAR violations without the need for additional Treasury regulations,
and, as shown below, the old regulation will not bear the freight the
Defendants attempt to foist upon it."); *United States v. Horowitz*, 361 F.
Supp. 3d 511, 515-16 (D. Md. 2019) ("31 C.F.R. § 1010.820(g)(2) cannot be
enforced in light of its conflict with 31 U.S.C. § 5321(a)(5)(C)(1) and [the]
more recent provision from the IRS's Internal Revenue Manual."); *Kimble v.
United States*, 141 Fed. Cl. 373, 389 (2018) ("[The 2004 amendment] replaced
the prior penalty for willful violations of federal tax law in 31 U.S.C. §
5321(a)(5) (2003), thereby nullifying any inconsistent regulations governing
the pre-2004 statute."); *Norman v. United States*, 138 Fed. Cl. 189, 196
(2018) ("[B]ecause § 5321(a)(5)(C)(i) mandates that the maximum penalty be
set to the greater of $100,000.00 or 50 percent of the balance of the
account, the regulation is no longer consistent with the amended statute.").

[4] *United States v. Colliot*, No. 16-cv-1281, 2018 WL 2271381 (W.D. Tex. May 16,
2018) ("Since § 1010.820 can be applied consistent with § 5321(a)(5), the
Court concludes § 5321(a)(5) does not implicitly invalidate or supersede §
1010.820."); *United States v. Wahdan*, 325 F. Supp. 3d 1136 (D. Colo. 2018)
("The statute sets a higher cap than does the regulation; instead, the
penalty cap in the regulation is, in essence, a subset of the penalties that

below, this Court follows the majority in finding that the regulation is no longer valid and, consequently, that the IRS is not constrained by the $100,000 penalty ceiling set forth in the outdated Treasury regulation.

## II. The Treasury Regulation Limiting the Willful FBAR Penalty to $100,000 Is No Longer Valid

The parties' dispute turns principally on the validity (or lack thereof) of 31 C.F.R. § 1010.820(g). *First*, the parties disagree as to whether the regulation is inconsistent with its authorizing statute such that it is no longer valid. *Second*, the parties disagree as to the proper level of deference to be accorded to the regulation. *Finally*, the parties disagree as to whether the IRS abused its discretion in imposing a penalty in excess of the cap imposed by the regulation.

### a. The Treasury Regulation Is Inconsistent with Its Authorizing Statute

The Court first considers whether the regulation is invalid on the basis of a conflict with its authorizing statute. It is well-established that "[r]egulations, in order to be valid, must be consistent with the statute under which they are promulgated." *U.S. v. Larionoff*, 431 U.S. 864, 873 (1977); *see also, e.g., Conn. Performing Arts Foundation, Inc. v. Brown*, 801

---

could be imposed under the statute. The statute does not mandate imposition of the maximum penalty, but instead gives the Secretary discretion to impose penalties below the statutory cap. This means that compliance with the lower cap set in 31 C.F.R. § 1010.820(g) also complies with 31 U.S.C. § 5321.").

F.2d 566, 569 (2d Cir. 1986).  Thus, where a regulation is
inconsistent with its authorizing statute, the conflict must be
resolved in favor of the statute.  *See, e.g., Ga. Dep't of Med.
Assistance v. Heckler*, 768 F.2d 1293, 1299 (11th Cir. 1985)
(holding that an agency's regulation has no effect following
subsequent contrary legislative enactment).  A regulation also
does not remain valid simply because it is not "technically
inconsistent" with the statute's language where it is
"fundamentally at odds with the manifest congressional design."
*U.S. v. Vogel Fertilizer Co.*, 455 U.S. 16, 26 (1982) (citing
*U.S. v. Cartwright*, 411 U.S. 546, 557 (1973)).[5]

The Court's analysis begins with a review of the plain
language of the amended penalty statute.  *See Estate of Pew v.
Cardarelli*, 527 F.3d 25, 30 (2d Cir. 2008) ("We first look to
the statute's plain meaning; if the language is unambiguous, we
will not look farther."); *see also Chevron, U.S.A., Inc. v.
Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ("When a
court reviews an agency's construction of the statute which it

---

[5] *See also Diersen v. Chicago Car Exchange*, 110 F.3d 481, 486 (7th Cir. 1997),
*cert. denied*, 522 U.S. 868 (1997) (finding a rule invalid where it violated a
statute's "broad purpose."); *Vierra v. Rubin*, 915 F.2d 1372, 1376 (9th Cir.
1990) ("A court may invalidate an agency regulation if it 'is not reasonably
related to the purposes of the statute it seeks to implement' or if
legislative history reveals a clear expression of congressional intent that
runs contrary to the regulation." (quoting *Conn. Dep't of Income Maintenance
v. Heckler*, 471 U.S. 524, 538 (1985))); *N.L.R.B. Union v. Fed. Labor
Relations Auth.*, 834 F.2d 191 (D.C. Cir. 1987) (holding that where a party
challenges the consistency of agency regulations with their underlying
statutes, the court must determine whether the challenged regulations
contravene legislative intent, and if so, then they must be struck down).

administers, it is confronted with two questions.  First,
always, is the question whether Congress has directly spoken to
the precise question at issue.  If the intent of Congress is
clear, that is the end of the matter; for the court, as well as
the agency, must give effect to the unambiguously expressed
intent of Congress.").

In the 2004 amendment of § 5321, Congress added a
penalty for non-willful violations, with a ceiling of $10,000.
31 U.S.C. § 5321(a)(5)(B)(i).  Congress further provided that
"[i]n the case of any person willfully violating, or willfully
causing any violation of, [the FBAR reporting requirement], the
maximum penalty . . . *shall be increased* to the greater of (I)
$100,000, or (II) 50 percent of the [balance in the account at
the time of the violation]."  *Id.* § 5321(a)(5)(C)-(D) (emphasis
added).  Congress did not, as in other subsections, *see, e.g.*,
31 U.S.C. § 5321(a)(5)(A) (providing that the Secretary "may"
assess a penalty), grant the Secretary any discretion to deviate
from its directives.  Rather, Congress used the imperative
"shall" to indicate that where a violation is willful, the
penalty ceiling *must* be increased to *the greater of* $100,000 or
50 percent of the balance of the unreported account(s) at the
time of the violation.  *See Salahuddin v. Mead*, 174 F.3d 271,
274 (2d Cir. 1999) ("There is no doubt that 'shall' is an
imperative . . . .").  The text of the statute is unambiguous;

22

Congress mandated an increase of the penalty ceiling for willful
FBAR violations to a specific point – the greater of $100,000 or
50 percent of the account's balance. *Norman*, 138 Fed. Cl. at
196.  Title 31 C.F.R. § 1010.820 sets a lower penalty ceiling,
is thereby inconsistent with its authorizing statute, and is
thus no longer valid. *See supra* note 2 (collecting cases);
*Hawkins-El v. First Am. Funding, LLC*, 891 F. Supp. 2d 402, 408
(E.D.N.Y. 2012) ("[A]n administrative agency's regulation is
ineffective to the extent it conflicts with its parent
statute."); *Matthew v. RCN Corp.*, No. 12-cv-185, 2012 WL 5834917
(S.D.N.Y. Nov. 14, 2012) ("[T]o to the extent that the Notice
could be read to conflict with [the statute], it would plainly
be unenforceable, as the IRS lacks authority to abrogate a
statute through its rulemaking authority.").

The Defendants nevertheless argue that, despite this
clear language, the regulation and statute are not technically
inconsistent.  The Defendants rely principally on the fact that
Congress granted the Secretary discretion as to whether to
impose a penalty, and only cabined this discretion by setting a
penalty ceiling.  In the Defendants' view, this means that the
Secretary could, as a rule, cabin his own discretion to impose
penalties so long as the imposed ceiling fell within the
boundaries authorized by Congress.  But this argument relies on
a misunderstanding of the Secretary's discretion under the

statute.  Congress only granted the Secretary discretion on specific matters pertaining to the imposition of an FBAR penalty.  The Secretary could consider whether a penalty was warranted in a given case, and if so, where the appropriate penalty in that case should fall within the statutory penalty range.  "However, merely because the statute vested the Secretary with discretion on some matters, it does not follow that the statute necessarily vested the Secretary with the discretion to change the maximum penalty as established by Congress."  *Schoenfeld*, 2019 WL 2603341, at *4.

In fact, the statutory language suggests otherwise, stating what the maximum penalty "shall be."  *Id.*  "[T]he plain language of § 5321 shows that Congress did not intend to delegate the determination of the maximum penalty to the Secretary."  *Id.*  The Secretary may, on a case-by-case basis, impose penalties below the statutory maximum.  But he cannot effectively abrogate the statute and the maximum penalty specifically set by Congress by promulgating (or failing to repeal) a regulation providing a different penalty ceiling.  *See, e.g., Martin v. Yellow Freight Sys. Inc.*, 793 F. Supp. 461, 468 (S.D.N.Y. 1992) ("A regulation may not serve to amend a statute or to add to the statute 'something which is not there.' In promulgating regulations, an agency is required to give effect to the will of Congress as expressed in the statute."

(quoting *Iglesias v. United States*, 848 F.2d 362, 366 (2d Cir. 1988)).  Defendants argument that the regulation should be saved is therefore unavailing.  *Perriello v. Napolitano*, 579 F.3d 135, 142 (2d Cir. 2009) ("[I]t it is not a judicial role to save a regulation that now conflicts, at least in part, with the underlying statute.").

Although the majority of courts have found the amended statute to be inconsistent with the regulation, two courts have disagreed.  These courts adopted the Defendants' reading of the statute not as mandating that the penalty ceiling be raised, but as simply allowing the Secretary to impose higher penalties.  To the extent that this division suggests there is some ambiguity in the statutory language, it is resolved by reference to Congress's intent in amending the statute.

Congress raised the penalties for willful FBAR violations after learning of the sheer number of individuals "using offshore bank accounts to engage in abusive tax scams." *General Explanation of Tax Legislation Enacted in the 108th Congress*, at 378.  Congress determined that to improve compliance with the FBAR requirement, and to stem the increasing number of violators, it was necessary to "increas[e] the prior-law penalty for willful non-compliance." *Id.*  Importantly, while one chamber initially proposed raising willful FBAR penalties, the other did no such thing.  Congress's choice to

adopt the former approach, rather than retaining the prior ceiling, effectively represents a rejection of the prior ceiling as insufficient to ensure compliance with the FBAR requirement.[6] Thus, allowing the Secretary to abrogate that new ceiling by regulation would, in effect, allow him to reject Congress's judgment that higher penalties were necessary to ensure compliance with the FBAR requirement.  The regulation is therefore "fundamentally at odds with the manifest congressional design" and would also be rendered invalid on this basis.  *Vogel Fertilizer Co.*, 455 U.S. at 26.

> b. The Treasury Regulation Does Not Merit the Deference Defendants Seek to Ascribe to It

Moreover, even assuming that 31 U.S.C. § 5321(a)(5) granted the Secretary discretion to abrogate the penalty ceiling in the statute by regulation, it is not apparent that the Secretary exercised his discretion to do so in this instance. The Defendants' assertion that the Secretary exercised his discretion *ipso facto* by promulgating this regulation in 1987 misunderstands the regulation's import.

*To begin*, the Secretary did not promulgate 31 C.F.R. § 1010.820(g) pursuant to notice-and-comment rulemaking, as would

---

[6] The Government notes that Defendants' attempt to limit their father's liability to $200,000 based on unreported accounts totaling over $8.5 million underscores the congressional recognition that the $100,000 penalty was insufficient to compel compliance, including by Defendants' father, with the FBAR requirements.  (Defs.' Br. at 23-24.)

presumably be necessary to abrogate his own statutory authority.
Notice-and-comment rulemaking requires the agency to provide
notice to the public of the proposed rule. *See* 5 U.S.C. § 553.
The notice issued by the Secretary prior to the promulgation of
31 C.F.R. § 1010.820(g) did not provide notice that the
Secretary would be amending the regulation to reflect the new
civil penalties for willful FBAR penalties as provided for by
the MLCA.  This is, of course, not surprising, given that the
new penalties in the MLCA did not become law until *after* the
notice of proposed rulemaking took effect.

The Defendants, however, still seek to ascribe the
"force of law" to 31 C.F.R. § 1010.820(g) on the basis that it
was, in their mistaken view, promulgated via notice-and-comment
rulemaking.  The Defendants point to the fact that the APA
simply requires that a notice contain a "description of the
subjects and issues involved" in the proposed rulemaking.  5
U.S.C. § 553.  The Defendants argue that "[i]n publishing the
[1986] notice, Treasury clearly identified for the public that
the rulemaking aimed to address the penalty for willful
violations, and the final rule did indeed address the subject of
willful violations."  (Defs.' Rep. Br. at 6.)

It is important to reiterate, however, that the notice
specified that the Secretary would be amending the penalty
provision to incorporate revisions to penalties arising

specifically from the Comprehensive Crime Control Act of 1984. *See* 51 Fed. Reg. 30236. In light of this, and the fact that the new statutory penalties had not yet come into effect, this Court disagrees that the foregoing Treasury statement was sufficient to provide notice of the specific regulation at issue in this action. *See, e.g., Fertilizer Inst. v. E.P.A.*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (providing that the "notice must 'provide sufficient detail and rationale for the rule to permit interested parties to comment meaningfully'"). The regulation, 31 C.F.R. § 1010.820(g), was not promulgated pursuant to notice-and-comment and accordingly need not be repealed that way.[7]

*Furthermore*, there is no indication that the Secretary intended to constrain his authority to impose civil penalties whatsoever. To the contrary, in promulgating the regulation in 1987, the Secretary indicated that he intended to enforce the BSA "to the fullest extent possible." 52 Fed. Reg. at 11440. The regulation adopted the maximum penalties authorized by the FBAR statute at that time, and did so by adopting the statutory language almost verbatim. The United States Supreme Court has made clear that an agency does not exercise its discretion where, as here, "instead of using its expertise and experience

---

[7] As other courts have noted, the *Colliot* decision rested in large part on the presumption that the regulation was promulgated pursuant to notice-and-comment. This is not the case.

to formulate a regulation, it has elected merely to paraphrase the statutory language[.]" *United States v. Gonzales*, 546 U.S. 243 (2006). The regulation thus appears to have been nothing more than an "interpretive" regulation that lacks the "force and effect of law." *See, e.g., Garrity*, 2019 WL 1004584, at *3.[8]

 *Finally*, the Secretary's failure to repeal the regulation following the subsequent 2004 amendment of § 5321, which increased the penalty ceiling, does not mean that he intended to constrain his own discretion at that time. (Defs. Rep. Br. at 8.) The rationale for the initial regulation was simply to "reflect civil penalties applicable" in the then-current iteration of the statute. (Gov't's Br. at 20.) Since the statute no longer reflects those penalties, the rationale for the regulation is no longer tenable, and the Secretary would likely need to explain his rationale for maintaining the lower penalty cap to affirm the regulation's ongoing validity. *See N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 132 (2d Cir. 2001). This view is supported by the

---

[8] The following discussion by the United States Supreme Court explains the distinction between legislative and interpretive rules: "The [APA] establishes the procedures federal administrative agencies use for 'rule making,' defined as the process of 'formulating, amending, or repealing a rule.' The APA distinguishes between two types of rules: So-called 'legislative rules' are issued through notice-and-comment rulemaking, and have the 'force and effect of law.' 'Interpretive rules,' by contrast, are 'issued . . . to advise the public of the agency's construction of the statutes and rules which it administers,' do not require notice-and-comment rulemaking, and 'do not have the force and effect of law.'" *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1200-01 (2015) (internal citations omitted).

United States Supreme Court's recognition of the Treasury's "relaxed approach to amending its regulations to track code changes is well documented," which means a failure to amend a regulation is "more likely a reflection of the [Secretary's] inattention than any affirmative indication on its part to say anything at all." *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 837 (2001). Defendants' arguments on the point are therefore respectfully rejected.

### c. The Regulation Is Not Saved by the Mere Fact that Treasury Did Not Formally Repeal It

It is clear from the foregoing that the regulation is no longer valid, and that the regulation does not merit the weight ascribed to it by the Defendants. *Garrity*, 2019 WL 1004584, at *2. Nevertheless, the Defendants still contest the IRS's ability to stray from the regulation's terms in light of the enforcement scheme. (Defs.' Rep. Br. at 8.) The Defendants argue that the IRS remains bound by the regulation both because the IRS does not have the authority to repeal it, and because the IRS's position that the regulation is "obsolete" is not controlling. The Court finds these arguments unavailing.

As an initial matter, the Defendants argue that the IRS lacked the authority to invalidate the Treasury regulation. (*Id.* at 10-11.) According to Defendants, under the administrative scheme, the IRS was entitled only to enforce the

regulations promulgated by Treasury; it did not have the authority to amend or disregard otherwise-valid regulations. (*Id.*) Thus, Defendants contend, the IRS could not avoid compliance with a regulation that had not yet been repealed by Treasury. (*Id.*) However, "[t]he fact that [a regulation] had not been formally withdrawn from the Code of Federal Regulations does not save [it] from invalidity." *Barsëback Kraft AB v. U.S.*, 121 F.3d 1475, 1480-81 (Fed. Cir. 1997). That FinCEN had not formally withdrawn or revised the regulation at the time of Mr. Khan's violation does not resuscitate the superseded regulation. As noted above, it is "more likely a reflection of the [Treasury's] inattention than any affirmative indication on its part to say anything at all." *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001).

Moreover, Defendants also challenge the Government's assertion that the IRS was "uniquely positioned to interpret the Treasury Department regulations governing [the assessment of civil FBAR penalties]." (Defs.' Rep. Br. at 11.) They argue that the IRS's interpretation of the regulation as obsolete was improper, and even if not, does not merit deference because the IRS was not delegated authority to amend the regulation. (*Id.*) The Court acknowledges that the IRS's interpretation may not be controlling, but it is entitled to some deference. *See Park*, 2019 WL 2248544, at *9 ("The IRM does not have the force of law,

but it 'has been used, on a limited basis, to provide guidance in interpreting terms in regulations.'" (citing *Horowitz*, 361 F. Supp. 3d at 515)). Regardless of how the IRS interpreted the regulation, however, the regulation was superseded by statute and, consequently, is no longer valid. The IRS was therefore no longer bound by its constraints.

### III. The IRS Properly Assessed a $4,264,728 Penalty Against Mr. Khan for His Willful FBAR Violations

The Defendants argue that the IRS abused its discretion exclusively on the grounds that it did not comply with 31 C.F.R. § 1010.820(g). While it is an abecedarian principle of administrative law that "agencies must comply with their own regulations," *Mantena v. Johnson*, 809 F.3d 721, 729 (2d Cir. 2015), the regulation upon which the Defendants rely was superseded and, as our sister court recently explained, "will not bear the freight the Defendants' attempt to foist upon it," *Garrity*, 2019 WL 1004584, at *2. In light of the superseded statute, and the fact that the Defendants do not provide an alternative argument as to why the IRS abused its discretion, their motion must be denied.[9]

---

[9] In addition to relying on the purportedly valid Treasury regulation, the Defendants also raised a number of other affirmative defenses. (Answer.) These included that: (1) the Government failed to establish that Mr. Khan "willfully" failed to report his accounts; (2) the statute of limitations barred the complaint; (3) the Court lacked jurisdiction over this matter; and (4) that the penalty violated the Eighth Amendment's Excessive Fines Clause. (Id.) The Defendants, however, either withdrew these defenses or did not

Furthermore, the Court agrees with the Government that, based on the undisputed facts, it is entitled to summary judgment as a matter of law.  There are no genuine issues of material fact relevant to the Government's cross-motion, as the parties stipulated to the underlying factual issues.  The Defendants stipulated that Mr. Khan willfully failed to file Form TD F 90-22.1, FBAR, for the 2008 year as required by 31 U.S.C. § 5314 and its implementing regulations.  (Stip.)  the subject FBAR was due June 30, 2009, and should have reported two bank accounts held by Mr. Kahn at Credit Suisse in Switzerland. (*Id.*)  As of June 30, 2009, each account held over $100,000, with an aggregate value of $8,529,456.  (*Id.*)  The IRS was consequently entitled by statute to assess a penalty in the amount of $4,264,728, representing 50% of the aggregate balance in the accounts as of June 30, 2009.

The Government also asserts that it is entitled to late-payment penalties and interest.  The Government is correct that it is entitled to late-payment penalties, 31 U.S.C. § 3717(e)(2), and interest (at a rate fixed by regulation), *id.* § 3717(a)-(c).  Both begin to accrue on the day the assessment is first mailed to the debtor.  31 U.S.C. § 3717(b).  The Government has alleged that it assessed the penalty on December

---

provide any facts or legal grounds in support of them in their motion for summary judgment.

18, 2015. (Compl. ¶ 35.) The Defendants, however, denied that the penalty was assessed on that date. (Ans. ¶ 35.) The Government has not submitted evidence establishing that the assessment was made on December 18, 2015. Therefore, though the Government is entitled by statute to both interest and late-payment fees from the date of the assessment, the Government must submit evidence establishing the date the assessment was made. Defendants may respond. The late-payment penalties and interest will continue to accrue until the FBAR penalty is paid.

## CONCLUSION

For the reasons set forth above, the Court finds that the IRS's assessment of the foregoing penalty was not an abuse of discretion, arbitrary, or capricious. The Defendants' motion for summary judgment is denied. On the other hand, the Court finds that, based on the undisputed stipulated facts, the Government is entitled to summary judgment in this matter against the Defendants in the amount of $4,264,728, plus late payment penalties and interest (to be determined upon submission by the Government and Defendants of evidence as to when the penalty was assessed). The Government's cross-motion for summary judgment is therefore granted. Entry of final judgment

will be held in abeyance pending resolution of the late-payment penalties and interest.

**SO ORDERED.**

Dated:      September 22, 2019
            Brooklyn, New York

                              /S/ USDJ KIYO A. MATSUMOTO
                              _____
                              Hon. Kiyo A. Matsumoto
                              United States District Judge

35